I dissent from the opinions just delivered. While I am sensible of their learning and concede their ability, I dissent from much of their reasoning, and from their legal conclusions. I dissent from them because they sanction an exercise of legislative power never before exerted in this state, a power which deprives a portion of its people *Page 557 
of rights hitherto deemed to be of the utmost value, the right to select their own local officers, and to conduct their own local administration; and which is, in effect, subversive of the form of government framed under the constitution. At the consultation which ensued upon the close of the argument, my brethren, with a single exception, seeing no constitutional impediment, expressed their opinions in favor of the validity of the act of the 15th of April, 1857, to establish a metropolitan police district, and to provide for the government thereof. Nothing has since occurred to reverse that opinion. I recognize their greater learning, their maturer wisdom, their riper judgment; and I bow before their superior authority. Yet I cannot surrender the convictions of my own mind, convictions carefully and deliberately formed, and sincerely and conscientiously entertained. In vindication of the dissent which I am constrained to express, I propose to enter into such an examination of the constitutional power of the legislature to pass this act, as the pressure of my daily employments, and the protracted sessions of the court have permitted me to make, and by some arguments drawn from the express words of the constitution; from its spirit and manifest intention; from the objects to be attained by its various provisions; from the adjudications of the courts, and the commentaries of learned writers, to disprove, if I can, the existence of the power which the legislature have thought fit to exercise. If the principle of the act affected property and private rights only, there are considerations which would constrain me to silence. But apprehending, as I do, that it may be made a precedent for measures which no man can foresee, and the consequences of which none can estimate, I think it right to place, side by side with the opinions given in affirmance of its force and validity, some reasons why they do not command my concurrence and assent.
Limitation upon legislative power is one of the purposes to be effected by a written constitution. An absolute, un *Page 558 
qualified grant of the power to make laws implies the power to do whatever the sovereign people themselves might do; and places the frame and structure of the government, as well as every other subject to be affected by law, at the disposal of the legislature. Without the limitations and restraints usually found in written constitutions, the government could have no elements of permanence and durability; and the distribution of its powers and the vesting their exercise in separate departments would be an idle ceremony. The right of self-government in the local bodies, and the power of the people of those communities to select the local officers and conduct the local administration, a right of very ancient origin, and hitherto deemed to be of inestimable value, would utterly disappear, or exist only at the pleasure of the legislature. These limitations need not appear by express terms. Negative words are not essential to create a valid limitation. It may appear and result by necessary implication, and have all the force of an express prohibition. Every lawyer knows this, and yet I think it worth while to enforce it by authority. "Necessary implication," says Lord ELDON, "means not natural necessity, but so strong a probability of intention, that an intention contrary to that which is imputed cannot be supposed. (Wilkinson v. Adams, 1 Ves. Beames, 466.) "It is an established rule in the exposition of statutes, that the intention of the lawgiver is to be deduced from a view of the whole, and of every part of a statute, to be taken and compared together. The real intention, when actually ascertained, will always prevail over the literal. Scire leges non est verba earumtenere sed vim ac potestatem." (1 Kent's Com., 162.) By the third article of the constitution, the legislative power is vested in a senate and assembly. Being vested in the senate and assembly, it is vested nowhere else; and so, whenever laws have been made dependent upon the vote of the people, they have been held void. This court so held in Barto v. Himrod (4 Seld.,
483). Judge RUGGLES there *Page 559 
says: "The exercise of this power (the power to re-make laws) is not expressly prohibited by the constitution, but it is forbidden by necessary and unavoidable implication." So the second section of the sixth article declares there shall be a Court of Appeals, and the third section of the same act that there shall be a Supreme Court, having general jurisdiction in law and equity. It is nowhere said there shall not be other courts with like authority. Yet the prohibition against their creation is too plain to admit of doubt. Hence it results, from this rule of construction, that what the people have done in the fundamental law, the legislature shall not do; and when that instrument prescribes a mode of exercising a function of government, such as making laws, administering justice, or selecting officers, the legislature are prohibited from prescribing a different mode. It is within the compass of the legislative power to create the office of chancellor and that of circuit judge. It requires no express constitutional authority to do this; and it is nowhere said it shall not be done. And why may it not be done? Because the prohibition results from the seventh section of the fourteenth article, which declares that the offices of chancellor and circuit judge are abolished from and after a given day. So, the instituting a court for the administration of justice would be within the powers usually exercised by legislative bodies, and it is not forbidden in express words. Yet the legislative disability to establish courts outside of the incorporated cities is clearly implied from the authority given in the fourteenth section of the sixth article, that "inferior local courts of civil and criminal jurisdiction may be established by the legislature in cities." The principle may be stated in this form: That the express grant of authority, that an institution may be created within certain given civil divisions of the state, or that certain powers and jurisdiction shall be exercised by certain courts or officers of the state is equivalent to a direct prohibition against creating similar institutions elsewhere, or conferring similar powers and jurisdiction *Page 560 
upon other courts or officers. For authority I refer to Dr.Foster's case (11 Coke, 59); Child v. Hudson Bay Company
(2 P. Wms., 209); Cohen v. Hoff (3 Brev., 500, 502, 504);Stradling v. Morgan (Plowd., 206); United States v.Morse (3 Story, 89; 11 Wend., 151; Broom's Leg. Max.,
414, 4th ed.).
The constitution of 1846 did not provide a government for a new people, for a community of men just collected together and without civil government. It was the amendment and reformation of a scheme already existing; the substantial and material institutions and forms of which had come down to us from our English ancestors. They embodied the reason, the wisdom and experience of many generations They were consecrated by time, by habit, by long usage, by tradition and the noblest historical associations. It was the object of the organic instrument to preserve them, to perpetuate them, to improve and perfect them by the knowledge and the suggestions of later times; not to impair their strength or deform their fair proportions. When the organic instrument uses terms and expressions, it uses them in the sense in which such terms and expressions were understood at the time it was made. And when it speaks of institutions, of officers, of civil and territorial divisions, it speaks of things then existing, which were signified by the terms and forms of expression which it employs. It is a rule of interpretation, arising ex directo from the text of the constitution, that "it is to be construed as a frame or fundamental law of government established by the people according to their own free pleasure and sovereign will. The powers which are conferred, the restrictions which are imposed, the authorities which are exercised, the organization and distribution thereof, which are provided, are in each case for the same object, the common benefit of the governed, and not for the profit or dignity of the rulers." (Story on Const., 408.) When the present instrument was formed, the entire territory of the state was separated, and appropriated by its civil divisions, *Page 561 
its counties, cities and towns. They were established by titles one, four and five of chapter two, part one, of the Revised Statutes; which statute is adopted by section seventeen of the first article of the constitution. Some of these civil divisions are referred to in many of its articles: in that in respect to the elective franchise; in its judicial and legislative articles; in that concerning corporations, and in that, also, which provides for the election and appointment of officers. These civil divisions are coeval with the government. The state has never existed a moment without them. All our thoughts and notions of civil government are inseparably associated with counties, cities and towns. They are permanent elements in the frame of government, and so treated in the instrument that creates it. Upon the plainest rules of interpretation they are to be regarded as institutions of the state, durable and indestructable by any power less than that which gave being to the organic law. They are subject to control and regulation by the legislature. It may enlarge or circumscribe their territorial limits, increase or diminish their numbers, separate them into parts, and annex some of the parts to parts of others; but they must still assume the form and be known and governed only as counties, cities or towns; because their distinctive character and attributes cannot be changed or destroyed without confounding the entire scheme of civil government provided in the instrument. The state at large is, and ever has been, an aggregate of these local bodies. They have habitually and uninterruptedly exercised many of the powers and functions of government.
These considerations lead me to the conclusion that it was designed to place these civil divisions and the powers of appointment, election and local administration which the people then exercised, beyond the reach of legislative abrogation and destruction. We learn from Blackstone, and the elementary writers, that the civil divisions of England, its counties, hundreds, tithings, or towns, date as far back as *Page 562 
the times of the great Alfred. In all the changes of policy, of dynasty, of peace and internal war, and even of conquest, which that country has undergone since his day, these organizations have never been abated or abandoned. They are substantially at this time what they were before the Norman invasion. Wherever the Anglo-Saxon race have gone, wherever they have carried their language and laws, these communities, each with a local administration of its own selection, have gone with them. It is here they have acquired the habits of subordination and obedience to the laws, of patient endurance, resolute purpose, and the knowledge of civil government, which distinguish them from every other people. Here have been the seats of modern civilization, the nurseries of public spirit, and the centres of constitutional liberty. They are the opposites of those systems which collect all power at a common centre, to be wielded by a common will, and to effect a given purpose; which absorb all political authority, exercise all its functions, distribute all its patronage, repress the public activity stifle the public voice, and crush out the public liberty.
It is another office of a written constitution to furnish, not a temporary, but a permanent system of government, with its distribution of powers, its limitations, restrictions and obligations, its guaranties of personal and local rights, unal terable and unchangeable by any power less than the sovereign power of the people. When it speaks of things, be they civil divisions, institutions, offices, or the rights of persons, it speaks of things which are to continue and exist so long as the government continues and exists. The legislature cannot, by changing the signification of terms, impair rights which those terms were employed to define. Thus, in the article which forbids the deprivation of private property without due process of law, the legislature cannot, by declaring that a specific article shall no longer be deemed property, deprive it of the protection given by the constitution. (Wynehamer v. The People, 3Kern., 378.) So, by the *Page 563 
words, due process of law, shall be intended the judgment of a court of competent jurisdiction, proceeding after the course of the common law; and not any contrivance which the legislature may substitute in its place, and denominate due process of law. (Taylor v. Porter, 4 Hill, 144.) Remedies to enforce contracts are within the power of the legislature. The contracts themselves are not. The legislature cannot, by acting on the remedy, impair the obligation of the contract. (Holmes v.Lansing, 3 John., 75; Green v. Biddle, 8 Wheat., 1;Bronson v. Kinzie, 1 How. U.S.R., 311; Morse v. Gould,
1 Kern., 281.) So, also by the same law of interpretation, if the constitution assures to the electors or the authorities of the counties, cities and towns, the right to select their local officers, and to conduct the local administration, the legislature cannot, by changing the names of counties, cities and towns into shires, arrondisements or municipalities or by uniting two or more of them together, and denominating it a district, take away the substantial right of local self government. What cannot be done directly shall not be done indirectly.
The constitution is more than a collection of mere words. It deals with ideas and operations of the mind which signify rights, privileges, powers, limitations and restraints, duties and obligations; and it employs words to impart those ideas. It is of no moment by what name these civil divisions are called. It is the thing which is to be protected and preserved, and not the name. It is of no moment that two of them are united into one, or one of them separated into two or three, and designated by another name; they still remain those civil divisions of the state in which, and for which, the people shall select their officers, and conduct the local administration. Brooklyn may be united with New-York, as Williamsburgh was with Brooklyn; but by denominating the two, when united, a municipality, a province, a department, or a district, even a legislative declaration that it shall not be a city, a county, or a town, *Page 564 
could not effect the destruction of its municipal or local rights, nor take from its electors the rights of selection and administration guaranteed by the constitution; because, when united, the two must take its place, for the purpose of government, in one of the classes of civil divisions recognized therein. So in regard to a union between the counties of Kings, Richmond and Westchester. Any other construction leads to consolidation; because what may be done for a part, may be done for the whole. Neither are the terms employed to, designate the officers, limited in their application to the officers in existence at the time when the instrument was framed, as has been asserted. Such would be a narrow and illiberal interpretation, and adopted as a guide, would defeat the objects which the framers thought to attain. When it employs the terms, county, city, town and village officers, it speaks of them as a class, and applies to them a general designation; intending to include therein those in being at the time as well as such as might be created thereafter. It cannot be supposed that it was intended to insure to the electors and authorities of these localities, the right to select those local officers whose offices were in being at the time, and put it in the power of the legislature to deprive them of the same right in respect to officers whose offices might be created thereafter. Such a provision would be afelo de se; for under color of creating new offices, with similar functions, those in being at the time might be substantially destroyed.
Section two of article ten, provides that "All county officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or appointed by the boards of supervisors or other county authorities, as the legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns or villages, or by some division thereof, or appointed by such *Page 565 
authorities thereof, as the legislature shall designate for that purpose." This is the only provision in respect to this class of officers, whose election or appointment is not provided for by the constitution. The whole state at the time was, and up to the period when the metropolitan police bill was to have effect, continued to be, divided for all the purposes of internal government and administration, separated into counties, cities, towns and villages. The provision quoted is plain enough, and its purpose seems definite enough. It admits of no interpretation but one, and that is a manifest intention to adhere to the scheme of local administration by counties, cities, towns and villages, and the right of the people to select the officers thereof by local elections or by the local authorities. The provisions of the metropolitan police bill are in conflict with this right. It is sought to be upheld upon two grounds: First. Because the said second section of the tenth article contains this further provision: "All other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the legislature may direct." It is the second branch of the passage last quoted, that in respect to officers whose offices might thereafter be created by law, which is thought to contain authority for the metropolitan police bill. It is worth while to notice, that the preceding part of the section which provides for the election or appointment of local officers, declares that the election shall be made by the electors of the respective counties, cities, towns or villages; while the passage last quoted, in respect to officers whose offices might thereafter be created by law, declares they are to be elected by the people, or appointed as the legislature may direct. In the counties, cities, towns and villages, the electors who are to elect are limited to the electors of the respective localities for which the officers are to be elected. But the officers *Page 566 
whose offices might be created thereafter by law, are to be elected, if elected at all, by the people, without limitation. The distinction between the two classes is significant and material. In the one, there is an express limitation to a locality, in the other, none whatever. By what people are the newly created officers to be elected? By the people of the locality in which, and for which, their services are to be performed, or by the people of the state? If by the people of the state, then the conclusion follows that the clause refers to officers whose functions are general and not local. The manifest distinctions between the electors who are to elect, in the one case, and those who are to elect in the other, is not unmeaning and accidental, but significant and intentional. It is the whole and not a part of the people who make the constitution, and speak its language; and wherever it employs the term "the people," it means the whole and not a fraction of the people. Thus, in its short and emphatic introduction, it says: "We, the people of the State of New-York, grateful to Almighty God for our freedom, in order to secure its blessings, do establish this constitution." So in section ten, article one: "No law shall be passed abridging the right of `the people' peaceably to assemble," c. And in section eleven of the same act: "The people of the state, in their right of sovereignty are deemed," c. In section fourteen, of article three, the enacting clause of bills is to be in the name of the people. The laws to authorize certain debts, are to be submitted to "the people." (§ 12, art. 7.) And certain constitutional amendments are to be submitted to, and approved by "the people." (§ 1, art. 13.) These references sufficiently indicate who is intended by the term "the people." I think, therefore, that it is the whole people of the state who are to elect the officers referred to in the concluding passage of the twenty-first section, and that their functions are not local but general, and in which the whole people have a common concern. *Page 567 
It is a sound rule of legal construction, as well as of literary criticism, that every part, nay every word of a statute or a written instrument shall, if possible, have effect. "One part of a statute must be so construed by another that the whole may, if possible, stand, ut res magis valeat quam percat. (1Bl. Com., 89.) The principle of the metropolitan police act, however, disregards and overrides this just and reasonable rule; because the power of appointment there asserted is in exclusion of the power of appointment and election by the authorities and electors of the local communities. The power claimed by the legislature, under the concluding clause of section two, is destructive of the power given to the electors and authorities of the counties, cities and towns by the two preceding clauses of the same section. Both cannot stand and have effect together. If, however, the concluding clause of the section be construed to apply to officers whose functions are general, of which the offices of canal auditor and superintendent of the bank department are examples, then the rules of construction and interpretation will suffer no violence; effect will be given to every clause contained in the section; the rights of the local communities will not be abridged, and the constitution will be maintained in its strength and integrity. Warner v. ThePeople (2 Denio, 272), is instructive in this connection. The legislature had, by an act, created a new officer and devolved upon him a part of the duties of the clerk of the city and county of New-York; which latter officer was, by the constitution, elective by the electors of the city. Both the Supreme Court and Court of Errors held the act void. Mr. Justice BRONSON said: "If the office may be divided and the duties be assigned to two officers, both must be chosen by the electors of the county. No other rule will give full effect to the constitution." The chancellor, in the Court of Errors, also said: "When the legislature assumes to take from a constitutional officer the substance of the office itself, and to transfer it to another who is to be appointed *Page 568 
in a different manner, and to hold the office by a different tenure than that which was provided by the constitution, it is not a legitimate exercise of the right to regulate the duties or emoluments of the office, but an infringement upon the constitutional mode of appointment."
The second ground upon which the metropolitan police bill is thought to be valid, is the literal adherence to the words of the first two clauses of the second section of the tenth article. It is said that the offices which the bill creates are neither city, county, town or village offices; that they are district offices, and not within the meaning of the section. We have already seen that changing the name of a thing cannot change its attributes and deprive it of rights derived from the fundamental law; nor changing the designation of a locality or civil division, deprive its inhabitants of the right of local government. What cannot be done in respect to one county or city, cannot be done to two or more, or to a part or parts of one or more of the same communities. The same law of interpretation by which we ascertain that the legislature cannot devolve the power to make laws upon others, that it cannot create chancellors, circuit judges, other Courts of Appeal, and other Supreme Courts, also tells us that it cannot institute and conduct government by districts, arrondissements or municipalities, because provision is made for instituting and conducting it by counties, cities, towns and villages. Expressio unius est exclusio alterius. Any other construction abrogates the essential and material provisions of the organic law, and places the form and structure of the government at the disposal of one of its departments.
We were referred, upon the argument, by the learned counsel for the defendants, to a series of acts in which it is thought the legislature have exerted, without question, the same power put in controversy in this action. They are laws creating commissions to construct bridges, public buildings and roads, and to locate and embellish parks and public *Page 569 
grounds. They bear no analogy to the act under examination. They give power to perform a given specific act, and when it is performed, the power ceases. Besides, constructing roads and bridges, and erecting public buildings, laying out and ornamenting parks and public grounds, are not governmental functions. They are acts which the government necessarily performs; but they do not affect rights or duties, public or private. Allusion has also been made to the power of the legislature over the senate and assembly districts. This it has, at certain periods and for certain specified purposes. These divisions exist, not for administration, but to distribute the representation.
The act under consideration creates a police district, to be composed of the counties of New-York, Westchester, Kings and Richmond. I need not give the substance of its numerous sectionsin extenso. It is enough for my purpose to say that it takes from the inhabitants of the cities of New-York and Brooklyn the power to elect, or by their local authorities to appoint, any part of the police force of either city. It vests this power in a commission of seven members, five of whom are to be appointed by the governor and senate. The other two are the mayors. At the time the act passed, both cities had a large organized police force holding their offices from the municipal authorities; while the rural towns of Kings and the counties of Westchester and Richmond had the customary police composed of town constables and sheriffs and deputies. The act effects no change in the police of these counties and rural towns, unless their boards of supervisors shall otherwise elect. Until such election, the constables chosen by the people of Westchester, Richmond and the country towns of Kings are to possess the authority conferred upon the patrolmen of the police force. The effect of the act upon the two urban communities is quite different. The moment the new board became organized it was vested with the exclusive control of the entire police force. The moneys to defray *Page 570 
the expenses of the city police force are to be raised by tax upon the real and personal property therein, collected and paid into the state treasury, and thence disbursed upon the warrant of the treasurer of the board of police. This is a striking innovation, and suggestive of coming changes. The officers are local, their official duties are local, and the cost of their support is a local charge. But the power of appointment and removal is not local. It neither belongs to the local authorities nor the local electors. To what end are all these novel provisions? The act evidently contemplates no police force proper outside of the limits of the two cities. Its expenses are not chargeable to the treasury of the state, or upon the people, or the property of the police district, but upon the taxable property of Brooklyn and New-York, not as a whole, but in parts, and in proportion to the force required for each. The primary purpose of the act is to take from the electors and authorities of the two cities all power of appointment and removal of the officers and members of the police force, and to place it, together with its patronage, at the disposal of the central government of the state. Its minor provisions are the means and appliances by which this purpose is to be effected. This may be a desirable and beneficial change. We are to inquire if it be lawful and right.
The precedent for this act is that of the 10th George IV.,ch. 44, which creates a metropolitan police for London and its vicinity. The distance extends from Charing Cross fifteen miles in every direction, includes the whole of Middlesex, large portions of Surrey, Hertfordshire, Essex, Kent, Buckinghamshire and Berkshire, for which seven counties the two commissioners are magistrates and the members of the police sworn constables. The commissioners are appointed by the crown and made responsible to the home secretary. It is worthy of remark that parliament, with its powers of legislation unrestrained by written limitations, so far respected the immemorial municipal rights of *Page 571 
the city of London and the inherent love which the English people entertain for local administration, that it left the municipal police force of the city in existence and entirely untouched by the act. A police officer under our system is a local officer, a city, county or town officer. He never was otherwise. His functions are local, not general. The preservation of the peace, the maintenance of order, the arrest and punishment of offenders and criminals, are offices purely local and not general, and have never been confided to other than local officers. A state police, with its prefect or chief at the seat of government and its agents and ministers distributed over the state, is a thing unknown and alien to our system. A state official sent down from the seat of the central authority to execute the criminal law in a distant county would be a novel and unusual spectacle, but it would be no more novel or unusual than to see a commission, emanating from the central authority, appointing and removing at pleasure the police force of an incorporated city. It cannot be denied, I think, that the police, whose single duty it is to preserve the peace and execute criminal process, by whatever name it may be called, is a local force, and its members local officers. And it has been conceded that, for the cities separately and independently, the power to appoint and remove them rightfully and constitutionally belongs to the city electors and city authorities, and not to any other power in the state. The provisions of the metropolitan police bill imply much more than they express. They imply nothing less than the power of the legislature to unite the entire state into a single district for the purposes of police, with its chief or prefect at the seat of the central authority, and its subordinate chiefs and agents in every city, town and hamlet in the state. The appointment and removal of its numerous force, the dispensation and distribution of its immense patronage, would follow as incident to the main power. The principle of the act asserts the existence of this authority in the legislature *Page 572 
without limitation or qualification. This is not all. The metropolitan act relates to police. The next act may relate to finance, to taxation and to revenue. The legislature may think it wise and expedient that the electors and authorities of the counties, cities, towns and villages shall no longer select their assessors, tax collectors and treasurers, as they have been accustomed to do. It may also think that boards of supervisors shall no longer sanction and apportion the assessments. This they must do, so long as the counties, cities and towns are held to be integral and indestructible institutions of the state, and the two first clauses of section two of article ten are of any force. But convert the entire state into a single district for the assessment and collection of taxes; create a board of finance commissioners, to be appointed by the governor and senate; vest in them the same power and authority, in respect to taxation and finance, that the metropolitan bill vests in its commissioners in respect to police; make the assessors, collectors and treasurers dependent upon the will of this board for their officers; collect into the state treasury the fifteen millions annually raised by taxation for local and general purposes, to be disbursed by the central government to its agents and officers; let the same scheme have effect as to the support and maintenance of the poor, the construction and repairs of bridges and highways, and the constitutional rights and privileges of the counties, cities and towns, as separate communities, will perish and become extinct in the presence of this modern rule of constitutional construction. I do not contemplate the possibility of such a result without apprehension.
It is said, however, that courts of justice have nothing to do with results and consequences, and take no concern in the effects of their judgments. Generally, and especially as to judgments which affect private rights only, I admit the force of the observation. I nevertheless deny its application to decrees and adjudications which affect public rights, *Page 573 
and involve the construction of statutes and ordinances, legislative or organic. In respect to them the courts are bound to consider what is to follow, and give the consequences some weight in their deliberations. If they will plainly be such as the framers could not have intended, such as will turn aside their purposes and frustrate their designs apparent upon the face of the instrument, then the construction which will produce such results must be rejected and avoided, and some other adopted in its place. Mr. Justice BLACKSTONE has remarked "that the intention of a law is to be gathered from the words, the context, the subject matter, the effects and consequences, and the reason and spirit of the law. That illustrations may be further derived from the subject matter with reference to which the expressions are used. That the effects and consequences of a particular construction are to be examined, because if a literal meaning would involve a manifest absurdity, it ought not to be adopted. And that the reason and spirit of the law and the causes which led to its enactment are often the best exponents of the words, and limit their application." (Story on Const., § 400.) Here is the authority of two of the great commentators upon English and American law, that effects and consequences are material elements in determining the sense of written instruments, and if a particular construction involves a contradiction or an absurdity it must be rejected. Hence, if the principle of the metropolitan police act is in conflict with the principle of the constitution; if it will impair rights and privileges there designed to be secured; if it will necessarily substitute the power of the legislature for that of the electors of the local municipal communities, and give to the former the power of appointment which the organic law reserves to the latter, then it involves a manifest contradiction, and cannot be upheld. The power of local appointment and administration cannot constitutionally exist in the electors and authorities of cities and towns, and in the central authority at the same time *Page 574 
The one power is, of necessity, in exclusion of the other. And this court must either construe the constitution so that local rights and privileges, expressly mentioned, and never until now questioned, shall remain to be exercised and enjoyed by the local communities, or sanction a construction which may, and indeed, can hardly fail, to exclude them altogether. It is not for me, in this place, to speak of the men who sat in the convention of 1846. Many of them, alas, too many, have closed their lives and gone to their account. But the record of their transactions, of what they said and did, remain for the information, I will not say instruction, of after times. And I am quite sure that there is not a single line or expression in that record which favors the intention imputed to them. Neither in the debates nor in the organic instrument which they framed, is there the slightest manifestation of a design to leave the legislature in possession of a power which might be wielded to the prejudice, far less to the destruction, of the rights and privileges reserved to the local communities.
The remedy for the ills and disorder which afflict the state will not be found in acts of doubtful constitutional validity, and which deprive individual citizens of inherent rights, or populous and powerful communities of franchises of immemorial antiquity. Such legislation may aggravate and protract the evil, but it will not restore health and strength to the political body. Under popular systems of government, laws depend for their utility, their force and efficacy, upon the enlightened moral sense of those upon whom they are to operate; and it is as unwise as it is unwarranted, to pass acts which impair inherent rights, in the vain hope of useful or beneficial results. If laws adequate to the government and regulation of great cities, and the security of persons and property therein, are impossible, under our present organic system, let us proceed to amend and reconstruct *Page 575 
it under one of the forms which it prescribes, rather than resort to legislative acts which are subversive of fundamental principles, and the faith and obligation of written compacts.
The judgment of the Supreme Court should be reversed.
COMSTOCK, J., expressed his concurrence generally, with the views and conclusions of this opinion.
All the judges, except BROWN and COMSTOCK, concurring,
Judgment affirmed.